Robert Byrnes (Cal. Bar No. 200761)
MOSS & BYRNES PLLC
187 Hollow Rd.
Staatsburg, NY 12580
212.587.2967
reb@mossbyrnes.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

JOAN HARRIS, an individual,
          Plaintiff,

v.

ADOBE INC., a California corporation; GRANT HAMLIN, an individual; and DOES 1-10,

          Defendants.

Case No.:

**DEMAND FOR JURY TRIAL**

COMPLAINT FOR:

(1) Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.);
(2) Age Discrimination in Violation of the California Fair Employment and Housing Act (Cal. Gov. Code § 12940 et seq.);
(3) Sex Discrimination in Violation of the California Fair Employment and Housing Act (Cal. Gov. Code § 12940 et seq.);
(4) Age Discrimination in Violation of the New Jersey Law Against Discrimination (N.J. Stat. Ann. § 10:5-1 et seq.);
(5) Sex Discrimination in Violation of the New Jersey Law Against Discrimination (N.J. Stat. Ann. § 10:5-1 et seq.); and,
(6) Intentional Infliction of Emotional Distress

## PRELIMINARY STATEMENT

1. Plaintiff Joan Harris brings this action against Defendants Adobe Inc. and her Adobe supervisor, Grant Hamlin, for unlawful discrimination based on sex/gender and age, and for wrongful termination in violation of federal and state laws.

2. Plaintiff, a former employee of Adobe, was subjected to a hostile work environment, disparate treatment, and retaliatory termination due to her sex/gender (female) and age, in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), the California Fair Employment and Housing Act (FEHA), the New Jersey Law Against Discrimination (NJLAD), and public policy.

3. Plaintiff, who has an extensive and successful history in the technology field, specifically in enterprise sales[1] and team management, was abruptly fired by Adobe in September of 2023 in retaliation for her having repeatedly complained to the company about having been subjected to age and gender discrimination by her younger, male supervisor, Defendant Grant Hamlin. It was Mr. Hamlin who personally, and seemingly unilaterally, fired Plaintiff, invoking pretextual "performance issues."

4. Plaintiff was immediately replaced by a younger male who had neither enterprise sales nor management experience.

5. During Plaintiff's four years at Adobe prior to Defendant Hamlin becoming Plaintiff's supervisor, however, no one at Adobe had ever identified "performance deficiencies"

---

[1] Also known as "complex sales," enterprise sales entails selling high-value products (here software applications), typically to large corporations.

as to Plaintiff. Rather, there had been recognition that to the extent that Plaintiff had occasionally missed performance targets, it had been entirely attributable to Plaintiff having inherited responsibility for a new sales region, as well as turnover, underperformance, protracted absences, and inexperience on her team—circumstances amply acknowledged by Defendant Hamlin's predecessor, Jonathan Hammond.

6. As is set forth more fully below, the starkly contrasting tenures of Jonathan Hammond and Defendant Grant Hamlin amply illuminate how Plaintiff's claims for sex and age discrimination and wrongful termination arose with the arrival of Mr. Hamlin and his discrimination-based machinations that set Plaintiff up to fail, and concluded with Mr. Hamlin personally terminating Plaintiff in retaliation for her having brought his conduct to Adobe's attention. For its part, Adobe effectively ignored and ratified Mr. Hamlin's conduct.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

8. The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same case or controversy.

9. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant's principal place of business is located in San Jose, California, within this District, and a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

10. Plaintiff Joan Harris is an individual residing in Summit, New Jersey. At all relevant times, Plaintiff was a remote employee of Adobe and a member of protected classes based on her sex/gender (female) and age (over 40).

11. Defendant Adobe Inc. is a Delaware corporation with its principal place of business at 345 Park Avenue, San Jose, California 95110. Adobe is an employer subject to Title VII, the ADEA, FEHA, and NJLAD, as it employs more than 15 employees and engages in interstate commerce.

12. Defendant Grant Hamlin is, on information and belief, an individual residing in Atlanta, Georgia, and at all relevant times Mr. Hamlin was Plaintiff's supervisor and acted as an agent of Adobe.

13. Defendants Does 1-10 are individuals or entities whose identities are currently unknown to Plaintiff but who participated in or are responsible for the discriminatory acts alleged herein. Plaintiff will amend this Complaint to include their true names upon discovery.

## ADMINISTRATIVE EXHAUSTION

14. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on April 2, 2024, alleging discrimination based on sex/gender and age and wrongful termination.

15. Plaintiff received a Notice of Right to Sue from the EEOC on February 4, 2025.

16. This action is filed within 90 days of receipt of the EEOC notice, satisfying all administrative prerequisites.

17. To the extent applicable, Plaintiff also complied with state administrative requirements or asserts that no such exhaustion is required for her state law claims.

## OVERVIEW OF CLAIMS

18. During her employment, Plaintiff performed her job duties competently and received positive performance reviews until the discriminatory conduct described herein began.

19. Specifically, Plaintiff has claims against Defendants for:

   a. <u>Hostile Work Environment Based on Sex/Gender</u>: Plaintiff's supervisor, Grant Hamlin, made derogatory comments about Plaintiff evoking gender-based stereotypes. These comments were frequent, severe, and created a hostile work environment.

   b. <u>Disparate Treatment Based on Sex/Gender</u>: Plaintiff was denied professional opportunities for which she was qualified, while similarly situated male employees were granted such opportunities.

   c. <u>Age-Based Discrimination</u>: Younger employees with less experience than Plaintiff were favored by Mr. Hamlin.

   d. <u>Wrongful Termination</u>: Plaintiff reported the discriminatory conduct to Adobe but received no meaningful response or remedial action. Instead, Plaintiff faced retaliation. Mr. Hamlin terminated Plaintiff's employment, citing "performance issues." This reason was pretextual, as Plaintiff's performance was consistently satisfactory, and the termination was motivated by her sex/gender, age, and/or Plaintiff's complaints about discrimination.

20. Defendants' actions violated federal and state laws prohibiting discrimination and wrongful termination, causing Plaintiff severe emotional distress, loss of income, and damage to her professional reputation.

**FACTUAL ALLEGATIONS**

21. Ms. Harris has built a successful career in enterprise sales, brokering large-scale sales between prominent technology companies and their clients, as well as managing a team of subordinates in fulfillment of that sales mission.

22. She started in the field in 1991 with Egghead Software (now Software Spectrum) before moving to Microsoft in 1996, where she remained for over 19 years.

23. At these companies, Ms. Harris achieved exemplary sales results and was consistently promoted to positions of greater management responsibility. Relatedly, Ms. Harris was recognized by her superiors and peers alike for her leadership concerning women in technology enterprise sales, as when she led the Women in Technology leadership program at Microsoft and organized a "CEO Summit" in response to the growing number of female CEOs among Microsoft's customer base.

24. In September of 2018, Ms. Harris moved from Microsoft to Adobe. In the interim between her moving from Microsoft to Adobe, Ms. Harris successfully battled breast cancer. Ms. Harris' first assignment at Adobe was as a Strategic Account Executive for Digital Media, before being promoted to Area Vice President for Digital Media.

25. At Adobe, Plaintiff received uniformly positive performance evaluations from 2018 through 2022.

26. Only in 2023, when Defendant Hamlin became her supervisor, did purported "performance issues" arise.

27. Ms. Harris' time at Adobe divides starkly between two time periods. During the first period, from 2018 through 2022, Ms. Harris thrived at Adobe, receiving consistently positive feedback on her performance. Much as her leadership on women's issues had been recognized at Microsoft, at Adobe Ms. Harris was nominated to Adobe's Leadership Circle by her supervisor, Jonathan Hammond.

28. To the extent that her performance fell short of established performance metrics, this was without exception attributable to factors beyond her control, typically a short-staffed, underperforming, or insufficiently experienced team.

29. During the period immediately preceding the events and circumstances constituting discrimination and retaliation against Ms. Harris, her supervisor was Jonathan Hammond. Mr. Hammond was no part of the discrimination and retaliation that Plaintiff alleges here. To the contrary, Mr. Hammond recognized the challenges Ms. Harris faced through no fault of her own; he did not seize on them as cover for a campaign of discrimination and retaliation, as did Defendant Grant Hamlin, Mr. Hammond's successor as Plaintiff's supervisor.

30. For instance, when Plaintiff inherited an underperforming team during her first quarters with Mr. Hammond as her supervisor, Mr. Hammond acknowledged that while Plaintiff's team would attain less than 70 percent of its revenue goal, that was attributable to deficiencies among Plaintiff's team members, not Plaintiff's managerial performance. In one performance evaluation exchange between Ms. Harris and Mr. Hammond that exemplifies this, Ms. Harris noted that "team selling capacity is lacking; we've had 3 out of 6 [team members]

engaging with customers and 'selling'; 2 with illness impacting selling capacity; 1 open position. This impacts outcomes for the business." Mr. Hammond responded, acknowledging the problems with Ms. Harris' team and commending her performance despite those problems: "The team is moving in the right direction . . . This is good progress with the team and how they are conducting business. Illness has handicapped the team[']s ability to be productive."

31. Thus for her first four years at Adobe, Ms. Harris excelled, was awarded Adobe stock in recognition of her doing so, and did so under the challenge of a persistently fragmentary and often inexperienced team.

32. Also during this time before Defendant Hamlin became Plaintiff's supervisor, there was no mention whatsoever of any "performance issues."

33. In January of 2023, however, Plaintiff's experience at Adobe changed radically. Adobe assigned a much younger man, Defendant Grant Hamlen, to supervise Ms. Harris. It is this second phase of Ms. Harris' time at Adobe, covering most of 2023, that gave rise to the claims that are the basis for this action.

34. Mr. Hamlen's arrival coincided with Ms. Harris being subjected to an increasingly hostile work environment, culminating with Adobe's retaliatory firing of Ms. Harris in September of 2023.

35. From the outset of his supervising Ms. Harris, Mr. Hamlen persistently made gender-coded remarks to her. For instance, Mr. Hamlen repeatedly told Ms. Harris that she was "too soft" and "not tough enough" and that she managed her team as if she was "hosting a party."

36. Additionally, Mr. Hamlen seized on the fact that Ms. Harris's team's most recent quarterly output had been somewhat diminished – because her team had been reduced by fully one-third due to unfilled departures – to put Ms. Harris on a "45-day plan."

37. Under Mr. Hamlen's plan, implemented in June of 2023, Ms. Harris would be evaluated as to the ensuing quarter as if she had her usual six team members, when in fact she had only four.

38. With this development, Ms. Harris surmised that Mr. Hamlen's conduct was not limited to verbal abuse but extended to his creating a pretextual basis for ultimately firing her and replacing her, perhaps with a younger man.

39. As it turned out, Ms. Harris had accurately assessed Mr. Hamlen's motives and objectives.

40. Apart from being evaluated as if she had a full team working under her, Ms. Harris was also subjected to various slights and adverse employment actions during the period between Mr. Hamlen's arrival and her termination. In June of 2023, at a meeting for sales teams like hers held in Utah, one Adobe presenter specifically mentioned every senior manager in attendance – except Ms. Harris.

41. The same petty and portentous exclusion of Ms. Harris repeated itself two weeks later, when the same Adobe speaker excluded any mention of Ms. Harris while referencing all other senior managers.

42. Predictably, both Ms. Harris and her team members grew increasingly uncertain about her status in the company.

43. In light of these circumstances, Ms. Harris lodged a complaint about Mr. Hamlen with Adobe's Employee Relations Counsel, or ERC, thereby following Adobe's internal procedures for reporting discrimination.

44. Immediately following Ms. Harris's complaint to the ERC, though, Mr. Hamlen only amplified his discriminatory campaign against her.

45. In sharp contrast to Plaintiff's time in which she had been supervised by Jonathan Hammond, Mr. Hamlen altogether ignored Plaintiff's input and marginalized her within Adobe. For instance, in her 2023 Second Quarter Performance Review, Ms. Harris noted, much as she had the prior year with Mr. Hammond, that she was still managing a team that was both incomplete and inexperienced: "[T]hroughout most of [the first half of 2023 my team] was at 66% rep participation (4 out of 6) – one was successfully managed out to another business and another one on medical leave. But, new hire was brought on May 2nd and another May 31st. While one still out on medical leave, my team is heading into [the second half of 2023] with 82% rep. participation (3 veterans, 1 rookie and 2 onboarding) . . ."

46. Far from the engaged, constructive response of Mr. Hamlen's predecessor, Jonathan Hammond, when Ms. Harris had noted similar challenges with her team a year earlier, Mr. Hamlen had no response at all.

47. Mr. Hamlen's only contribution to this Performance Review had been written *before* Ms. Harris had contributed her summary of the team she supervised. Mr. Hamlen's review included—for the first time ever during her time at Adobe—the assessment that "[Ms. Harris] is not meeting the minimum expectations of her current position."

48.     Yet Ms. Harris had managed to hire two new subordinates, bringing her team back to full strength (though one team member remained out on medical leave). Ms. Harris exceeded her revenue target in the third quarter of Adobe's 2023 fiscal year and was projected to hit at least 100 percent of her revenue target for the fourth quarter. This was chiefly attributable to Ms. Harris having a "2x pipeline" whereby she had, despite the challenges within the team she managed, created a revenue "pipeline" for the quarter fully double her revenue target.

49.     By the summer of 2023, therefore, Ms. Harris had reassembled her team and put it on an ascending trajectory.

50.     However, in early September of 2023, Mr. Hamlen abruptly told Ms. Harris that he was "looking to replace [her] seat." During the same conversation, Mr. Hamlen also told Ms. Harris that he needed to know when her "last day" would be despite Ms. Harris having never indicated that she was leaving Adobe, an intention she also reiterated in this conversation with Mr. Hamlen.

51.     With her concern about Mr. Hamlen's conduct heightened, Ms. Harris retained counsel, which conveyed to Adobe Ms. Harris's potential claims for age and gender discrimination.

52.     In response, Adobe told Ms. Harris's then-lawyer that she was not being terminated, and that Mr. Hamlen was merely "managing her performance" in the ordinary course of business.

53.     Yet days later, while Ms. Harris was home sick with COVID-19, Mr. Hamlen fired her.

54. Defendants terminated Ms. Harris in September of 2023, just after her quarterly results had been inaccurately evaluated, and replaced her with a considerably younger male with neither enterprise sales nor management experience, much as Ms. Harris had predicted.

**FIRST CAUSE OF ACTION**
**Age Discrimination in Violation of the ADEA**
(Against Adobe and Does 1-10)

55. Plaintiff incorporates by reference all preceding paragraphs.

56. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

57. The ADEA prohibits discrimination against employees aged 40 or older because of their age. 29 U.S.C. § 623(a).

58. Adobe subjected Plaintiff to adverse employment actions because of Plaintiff's age.

59. Adobe's actions were willful and in violation of the ADEA, causing Plaintiff damages including lost wages, benefits, and emotional distress.

**SECOND CAUSE OF ACTION**
**Sex Discrimination in Violation of Title VII**
(Against Adobe and Does 1-10)

60. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

61. Title VII prohibits discrimination against employees because of their sex. 42 U.S.C. § 2000e-2(a).

62. Adobe subjected Plaintiff to adverse employment actions because of Plaintiff's sex.

63. Adobe's actions were intentional and in violation of Title VII, causing Plaintiff damages including lost wages, benefits, and emotional distress.

### THIRD CAUSE OF ACTION
### Age Discrimination in Violation of FEHA
(Against All Defendants)

64. Plaintiff incorporates by reference all preceding paragraphs.

65. Defendants terminated Plaintiff's employment in violation of public policy, as embodied in Title VII, the ADEA, FEHA, and NJLAD, which prohibit discrimination based on sex/gender and age.

66. The stated reason for Plaintiff's termination was pretextual, and the true motivation was Plaintiff's sex/gender, age, and/or her complaints about discriminatory treatment.

67. Defendants' actions caused Plaintiff to suffer damages, including lost wages, emotional distress, and reputational harm.

### FOURTH CAUSE OF ACTION
### Sex Discrimination in Violation of FEHA
(Against All Defendants)

68. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

69. FEHA prohibits discrimination against employees because of their sex. Cal. Gov. Code § 12940(a).

70. Defendants subjected Plaintiff to adverse employment actions because of Plaintiff's sex.

71. Defendants' actions were intentional and in violation of FEHA, causing Plaintiff damages including lost wages, benefits, and emotional distress.

### FIFTH CAUSE OF ACTION
### Age Discrimination in Violation of NJLAD
(Against All Defendants)

72. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

73. The NJLAD prohibits discrimination against employees because of their age. N.J. Stat. Ann. § 10:5-12(a).

74. Defendants subjected Plaintiff to adverse employment actions, including [e.g., denial of promotions, unequal pay, termination], because of Plaintiff's age.

75. Defendants' actions were intentional and in violation of the NJLAD, causing Plaintiff damages including lost wages, benefits, and emotional distress.

### SIXTH CAUSE OF ACTION
### Sex Discrimination in Violation of NJLAD
(Against All Defendants)

76. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

77. The NJLAD prohibits discrimination against employees because of their sex. N.J. Stat. Ann. § 10:5-12(a).

78. Defendants subjected Plaintiff to adverse employment actions, including [e.g., denial of promotions, unequal pay, termination], because of Plaintiff's sex.

79. Defendants' actions were intentional and in violation of the NJLAD, causing Plaintiff damages including lost wages, benefits, and emotional distress.

## SEVENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
(Against All Defendants)

80. Plaintiff incorporates all prior paragraphs as if fully set forth herein.

81. Defendants' discriminatory conduct was extreme and outrageous, exceeding the bounds of decency tolerated in a civilized society.

82. Defendants intended to cause, or recklessly disregarded the likelihood of causing, severe emotional distress to Plaintiff.

83. As a result, Plaintiff suffered severe emotional distress, including anxiety, humiliation, depression, and other damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare Defendant's actions unlawful and in violation of Title VII, the ADEA, FEHA, NJLAD, and public policy;

B. Compensatory damages, including lost wages, benefits, and emotional distress damages, in an amount to be determined at trial;

C. Punitive damages under federal, California, and New Jersey law, in an amount to be determined at trial;

D. Injunctive relief, including reinstatement, policy changes, and other equitable remedies to prevent future discrimination;

E. Attorneys' fees and costs as permitted by law, including under 29 U.S.C. § 626(b), 42 U.S.C. § 2000e-5(k), Cal. Gov. Code § 12965(b), and N.J. Stat. Ann. § 10:5-27.1;

F. Prejudgment and post-judgment interest;

G. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 2, 2025

Respectfully submitted,

_____/s/_____
Robert Byrnes (Cal. Bar No. 200761)

MOSS & BYRNES PLLC
187 Hollow Rd.
Staatsburg, NY 12580
212.587.2967
reb@mossbyrnes.com

Attorneys for Plaintiff Joan Harris